■ MARIE OLKO, Respondent, v CITIBANK, N.A., Appellant. [842 NYS2d 437]—

Judgment, Supreme Court, New York County (Ira Gammerman, JHO), entered December 27, 2005, after a jury trial, awarding plaintiff the total sum of $300,701, affirmed, with costs.

In this action to recover the principal sum plus interest on a certificate of deposit (CD), plaintiff presented evidence of the certificate of deposit, thus shifting the burden to defendant bank to establish the defense of payment, and, based on the evidence before it, the jury fairly concluded that that burden had not been met (*cf. Rosenstock v Dessar*, 109 App Div 10, 12, 13-14 [1905]). The court's charge was proper and did not misrepresent the testimony of the bank officer. Nor did the court's remarks and questions constitute the type of prejudicial interference that warrants reversal; rather, they served to clarify the testimony (*see Les S. Thompson & Co., LLP v Lucille Murray Child Dev. Ctr., Inc.*, 13 AD3d 120 [2004]; *Delcor Labs. v Cosmair, Inc.*, 263 AD2d 402 [1999], *lv denied* 94 NY2d 761 [2000]). It was not error to refuse to admit certain uncertified exhibits offered by defendant. Finally, contrary to defendant's contention, the complaint was not subject to dismissal by reason of laches, since plaintiff presented the CD immediately upon discovery. We have considered defendant's remaining arguments and find them unavailing. Concur—Mazzarelli, J.P., Saxe, Marlow and Kavanagh, JJ.

McGuire, J., dissents in a memorandum as follows: I respectfully dissent as I would reverse and direct a new trial in the belief that defendant Citibank did not receive a fair trial due to the cumulative effect of various errors committed by the judicial hearing officer who presided over the trial.

On May 15, 1987, plaintiff's mother, Janina Tobolka, opened a certificate of deposit with defendant in her name jointly with plaintiff; the amount of the certificate was $127,000 and its maturity date was May 16, 1988. At the time, Mrs. Tobolka was living in a fifth floor bedroom of the townhouse in Manhattan that plaintiff and her husband owned. Tobolka's health began to decline in the fall of 1989 after she fell and broke her hip, and she died in September 1994. In December 2002, plaintiff discovered the certificate of deposit in a shoe box in a closet in the bedroom her mother had occupied. Plaintiff had not previously had any knowledge of the account. Plaintiff's efforts to find out what had happened to the certificate eventually resulted in a letter from Citibank to the deceased Mrs. Tobolka stating that it had completed its investigation, that it retained records for seven years and that "[y]ou've indicated that the account was closed in 1988." Plaintiff thereafter commenced this action to recover the principal sum of the certificate of deposit plus interest.

At trial, plaintiff testified to the foregoing and that Mrs. Tobolka died without any assets as essentially all of her money had been spent on her care, including hip replacement surgery and treatment for uterine cancer. Mrs. Tobolka, according to plaintiff, had checking and savings accounts and plaintiff's "guess" was that she withdrew "[a] couple of hundred thousand" dollars from her mother's accounts to pay for her medical and home care. Prior to breaking her hip in the fall of 1989, Mrs. Tobolka was taking care of herself financially; she was "coherent" and "knew what she was doing."

On its case, defendant elicited testimony from a bank employee that during the period from 1987 through 1990 there was no requirement that when a customer engaged in a transaction involving an account that was documented by a passbook, as was the certificate of deposit opened by Mrs. Tobolka, the teller actually note the transaction in the passbook. With the computer system in place at the bank's branches, a customer could effect a transaction with the aid of a teller through a deposit or withdrawal slip. Asked by the judicial hearing officer what a customer with a passbook certificate of deposit (CD) would have to do to get the money, the witness responded as follows:

"A: Basically, the depositor has to fill out a withdrawal slip; show identification; we'll go to the files, make sure the signature's okay and everything's okay, and we'll issue a check or deposit it to another account.

"[JHO]: And do you do nothing with respect to the passbook?

"A: If they don't have the . . .

"[JHO]: Assume they have the passbook; what do you do?

"A: We could take the passbook from them, make the withdrawal . . .

"[JHO]: Let's assume they forgot to bring it that day, would you ask them to come back and bring the passbook?

"A: If they forgot it, yes.

"[JHO]: So if the passbook is available, you would want to get it from the depositor before you closed the account; is that correct?

"A: That's correct."

Defendant also elicited testimony that its record retention policy was seven years, that it investigated plaintiff's allegations after she came to a branch with the passbook in December 2002, and that it had been unable to locate any documents relating to the account. Two other aspects of the evidence warrant mention. First, defendant's employee testified that "when a CD matures, a client is sent a notice approximately thirty days prior to that, and if they don't do anything, the CD would roll over for an additional term at the rate then." Second, defendant introduced two records from the New York State Department of Taxation and Finance. One of the records stated that for 1990, Mrs. Tobolka's tax return reported income of $8,472, with no interest income. The other record stated that for the years 1991 through 1994, no income tax returns for Mrs. Tobolka had been located.

Obviously, the tax records were important to the position of the defense that Mrs. Tobolka had received the funds from the account and deposited the money in other accounts, and that the money had then been used for her care. In this regard, the tax records supported both the argument that Mrs. Tobolka reported no interest income in 1990 because the funds on deposit had been withdrawn and thus were not generating interest, and the argument that Mrs. Tobolka filed no income tax returns in the following year because she was no longer earning interest on such a substantial sum.

The jury first learned about the tax records from the judicial hearing officer shortly before summations. Rather than neutrally relate their content, the judicial hearing officer

instructed the jury as follows: "[JHO]: We have two documents that were recently received in evidence. The first is a certificate from the New York State Department of Taxation and Finance, which indicates that they made a search for tax records for Mrs. Tobolka for the years 1991, '2, '3 and '4. *Those are the years— based on the evidence—of her declining health*. And they could find no tax returns that she filed for those years" (emphasis added). The comment in italics clearly was not proper. There was evidence that Mrs. Tobolka's health had been in decline during those years and thus plaintiff had an evidentiary basis for an argument seeking to minimize the significance of the records. But the judicial hearing officer had no business making the argument for plaintiff. In her brief, plaintiff writes that the "inference" that no tax returns were filed because of failing health was "[c]ertainly . . . an inference that the jury could draw or not draw on its own." That, of course, is exactly the point. By drawing it for the jury, the judicial hearing officer intruded on the function of the jury to the detriment of defendant on an issue that was significant to the defense.

After thus downplaying the significance of the certificate, if not dismissing it outright, the judicial hearing officer immediately went on to refer to the other record from the Department of Taxation and Finance as follows: "They did find, *I guess*, what they keep as a computer record, *I guess*, of a tax return that she filed in 1990 which reflects that she reported of $8,427 . . . [and] she reported no interest . . . ." (Emphasis added.) Although the italicized expressions of uncertainty carried less potential for prejudice to defendant, they were gratuitous. Whether they were intended to suggest that the "computer record" was of uncertain reliability cannot be determined on this record. It is enough to note that these expressions of uncertainty could have been so interpreted by the jury and were unnecessary.

During his summation, counsel for defendant referred the jury's attention to the Taxation and Finance records, urging that they were significant and reminding the jury he had "touched" upon the records in his opening. He got only one sentence into his argument, however, before he was cut off by the judicial hearing officer.

"[COUNSEL]: If the CD continued to be effective, it would have accrued interest.

"[JHO]: Well, that's not clear from the record, counsel, either. The CD contains the following language: I'll read it to the jury. It says: 'No interest will be paid on this certificate after the maturity. At maturity'—and the maturity date is May 16, 1988—

'At maturity, if Citibank has received no other instructions in writing from the account owner, the account then on deposit will be placed in a day-to-day savings account.'

"We have no evidence as to what interest if any, a day-to-day savings account provides.

"Let's move on.

"[COUNSEL]: Judge . . . .

"[JHO]: Counselor, continue with your argument."

In the first place, there was a very good reason for the absence of any objection to the argument that "[i]f the CD continued to be effective, it would have accrued interest." That is, the argument was grounded squarely in the evidence. Neither party had previously drawn the jury's attention to the language in the CD that the judicial hearing officer read to the jury. As defendant pointed out in thereafter objecting to the court's interruption and instructions, by the express terms of the CD that language was inapplicable to a CD with a term of one year or less, like the one Mrs. Tobolka opened. Although the judicial hearing officer corrected his error in a subsequent instruction, the judicial hearing officer's erroneous and unprompted interruption of defendant's attorney's summation was prejudicial to defendant.[1]

In his instructions to the jury, the judicial hearing officer summarized plaintiff's evidence and advanced an argument that plaintiff's counsel had not made on his summation. Plaintiff, according to the judicial hearing officer, was relying:

"to some extent on the testimony of the bank officer who my recollection is testified that if someone who had a passbook—a CD passbook account came in, they would, in essence, take the passbook away or make some notation in the passbook. And if someone came in without the passbook, they would send them home to get the passbook.

"Although we may be living in a computer age, at least the testimony of the bank officer was that the passbook had some significance and an effort would be made to obtain it."

Contrary to this instruction, plaintiff did not make any such argument. The error, moreover, goes beyond a failure to summarize in a neutral fashion the actual positions of the parties. The judicial hearing officer did not recount accurately the testimony of the bank employee, and indeed misstated the witness' answers to hypothetical questions he posed. Thus, the wit-

---

1. Consistent with the erroneous interruption of defendant's counsel's summation, the court charged the jury that "we have no evidence as to what interest, if any, this type of day-to-day savings account would earn. So you have to determine whether the bank has sustained the burden of proof."

ness stated only that a customer would be asked to come back and bring the passbook "[i]f they forget it, yes" and that the bank would want to get the passbook from the depositor before closing the account if the passbook was "available." Contrary to the judicial hearing officer's instructions to the jury, the witness by no means broadly stated that "if someone came in without the passbook, they would send them home to get the passbook." In fact, as noted above, it was clear from the witness' testimony that a customer could close out a certificate of deposit account without the passbook. Significantly, no subsequent effort was made by the judicial hearing officer to correct this error when defendant objected to it and contended that the judicial hearing officer "committed reversible error in your references to [the bank employee's] supposed testimony about requiring an individual to go home and get his passbook." Rather, the judicial hearing officer erroneously insisted, "[t]hat's exactly what he said" (see Blaize v City of New York, 80 AD2d 594, 595 [1981] [trial court obligated to marshal the evidence in an accurate and balanced manner], citing Gilhooly v Piciocchi, 45 AD2d 961 [1974]; see also Theodoropoulos v New York City Health & Hosps. Corp., 90 AD2d 792 [1982]).

Another instruction by the judicial hearing officer was prejudicial to defendant. As noted, in response to plaintiff's inquiry, Citibank sent a letter addressed to Mrs. Tobolka, who had died years earlier. In his summation, plaintiff's counsel hardly mentioned the letter, referring only to the "unsigned" "form letter" sent "to [Mrs.] Tobolka some ten months after [plaintiff] makes initial inquiry." Nonetheless, the judicial hearing officer saw fit not only to mention the letter in his instructions to the jury, he editorialized about it as follows: "And you had this somewhat interesting—and perhaps it tells us how large corporations operate—this form letter addressed to the woman who died eight years before or nine years before, indicating that she had advised the bank, presumably in 2003, that she had withdrawn the funds in 1988. Indeed, that's the bank's position." To have referred to the letter was at best gratuitous, but the reference to "how large corporations operate" and the sarcastic aside ("presumably in 2003") were as uncalled for as they are improper.

Moreover, the judicial hearing officer interfered excessively in the questioning of the witnesses. Nearly half of the questions asked on cross-examination of the bank witness (some 13 of 30 questions) were posed by the judicial hearing officer. More importantly, to the extent information favorable to plaintiff was elicited on cross-examination of the bank witness, it was elicited

by the judicial hearing officer's questions, not by plaintiff's counsel's questions.[2] Nearly half of all the questions asked of plaintiff on direct and cross-examination (some 47 of 107 questions) were posed by the judicial hearing officer. Consistent with his overall lack of neutrality, the judicial hearing officer voiced both an approving and sympathetic comment during plaintiff's testimony.

This excessive intervention into the questioning of the witness is all the more unfortunate given that this Court has reversed verdicts in several other cases this judicial hearing officer presided over as a trial judge (*see Taromina v Presbyterian Hosp. in City of N.Y.*, 242 AD2d 505 [1997]; *Campbell v Rogers & Wells*, 218 AD2d 576 [1995]; *Harding v Noble Taxi Corp.*, 182 AD2d 365 [1992]; *Schaffer v Kurpis*, 177 AD2d 379 [1991]), including one in which the questioning did not display bias or prejudice (*Campbell*, 218 AD2d at 579). Plaintiff's case was far from a strong one, as it required the jury to accept that although Mrs. Tobolka had been taking care of herself financially and "knew what she was doing" at least until she broke her hip in the fall of 1989, she inexplicably forgot about more than $125,000 in the certificate of deposit after its maturity in May 1988, and that Citibank somehow and for some reason kept the money. Because the cumulative effect of the judicial hearing officer's conduct and errors may well have been outcome determinative, I would reverse and direct a new trial.

---

2. At one point, the judicial hearing officer asked the witness if, as far as he knew, records were ever lost at Citibank. When the witness responded, "No. Not that I know of," plaintiff's counsel began to ask, "You don't know . . . ," only to be cut off by the judicial hearing officer, who commented, "He knows of no records that were lost." Regardless of intonation, this editorial comment was not appropriate.